[No. 24662–3–I.   Division One.   May 20, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. SALVADOR CASTENEDA–PEREZ, *Appellant.*

*Scott Busby* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Jeanette Dalton, Deputy,* for respondent.

SCHOLFIELD, J.—Salvador Casteneda–Perez appeals his conviction for delivery of a controlled substance. We affirm.

## FACTS

The arrest of Casteneda–Perez arose out of a "controlled buy" by Seattle police officers on February 28, 1989. Officer Debbie Barnett testified that at approximately 6:30 p.m. on that date at the corner of Second and Pike in downtown Seattle, she approached Casteneda–Perez and asked him if he had some "coca". He replied, "Yes", and asked Barnett how much she wanted. She replied that she wanted $20 worth. At the time, Casteneda–Perez was standing in a group of people. Two of the people in the group ultimately were Casteneda–Perez' codefendants, Ricardo Rodriguez and Roberto Gonzales. Rodriguez pleaded guilty prior to trial.

After Barnett made her request to Casteneda–Perez, Rodriguez took a bindle of cocaine out of his mouth and

gave it to her. Barnett paid for the bindle of cocaine with two prerecorded $10 bills, which she testified she gave to the third codefendant, Roberto Gonzales.

Barnett then walked away from the group, and gave a prearranged signal to the other officers who were there as observers. These officers signaled to the arrest team, and the arrests were made.

Office Dennis Tichi testified that he arrested Rodriguez after receiving radio instructions to do so and found the two marked $10 bills on him. Tichi further testified that a total of four suspects were arrested. Barnett was shown the four photographs, and the fourth suspect was released after Barnett indicated that he was not involved in the transaction.

Officer David Unger was working as an observer that evening from one of the upper floors of a building across the street from where the transaction took place. There were a number of people milling about on the corner, and Unger saw Barnett make contact with someone Unger could only see from the knees down, due to an awning that obstructed his view. According to Unger, Barnett was in contact with this individual for several minutes before signaling the transaction was completed. Shortly thereafter, Unger was able to see the person with whom Barnett had been talking and identified the individual as Casteneda–Perez.

Officer Paul Grady testified that he was also an observer that evening, and he observed Barnett make contact with a group of four people. One of them walked away, and Barnett's contact with the other three lasted less than a minute. Grady testified that after the buy was completed, he focused his attention on Casteneda–Perez and Gonzales, and eventually told the arrest team to arrest them. Grady identified blue and white jackets that he claimed he saw Casteneda–Perez and Gonzales wearing.

After reviewing his notes, Grady corrected his testimony to indicate that it was Rodriguez and Gonzales whom he

had described to the arrest team. Apparently, neither Rodriguez nor Gonzales was wearing a blue and white jacket that evening; one wore a tan leather jacket and the other wore a black and red jacket. Grady also corrected his testimony to indicate that only Casteneda–Perez was wearing a blue and white jacket.

Rodriguez testified and admitted that he sold cocaine to an undercover police officer. However, he testified that he did not know either Casteneda–Perez or Gonzales and that he worked alone. On cross examination, the deputy prosecutor asked Rodriguez a series of questions designed to make Rodriguez respond that the police were lying in their testimony. In part, the testimony is set forth as follows:

> Q: So, if the officer who bought the cocaine from you testified that there were two other persons facing inward as those arrows on a drawing indicate, you would say that she's lying?
> MR. WACKERMAN: Objection, your Honor, calls for a comment on the evidence.
> THE COURT: Overruled.

The deputy prosecutor was then asked to repeat the question:

> Q: So, Mr. Rodriguez, what you are telling this jury is that Officer Barnett's testimony that there were yourself, her and two other persons all facing inward that Officer Barnett was telling a lie when she testified to that?
> A: Possibly. I don't know, there were so many people there around and I didn't notice and I don't know those two over there.

Rodriguez admitted that he was carrying the bindle in his mouth and that he delivered it to an undercover police officer. He denied, however, that the officer gave the money for the cocaine to someone else. The questioning continued:

> Q: So the officer is lying when she testifies that someone else took the money?
> A: It could be, because that's not the truth.

There was no objection to the foregoing question.

The deputy prosecutor then questioned Rodriguez about Officer Grady's testimony:

Q: Okay. Now, Mr. Rodriguez, if Officer Grady testified that he saw two other persons standing with you and Officer Barnett, would you say that he was lying?
A: Yes.

There was no objection to the foregoing question. After the question about police officers lying had been asked and answered several times, another question was asked and the defendant objected as follows:

Q: So, if Officer Grady testified that you were with someone else when you were arrested, he would not be telling the truth?
MR. WACKERMAN: Your Honor, we object again. The question is calling for the witness to [comment] on the truthfulness of the other witnesses.

The court overruled the objection. The question was never answered.

Casteneda–Perez testified and acknowledged that Barnett had approached him looking for cocaine. However, Casteneda–Perez testified that he shook his head when she asked him and said nothing. He testified that Barnett then began talking to some people behind him, and he did not see the cocaine transaction occur. On cross examination, the deputy prosecutor repeated the line of questioning she had used with Rodriguez:

Q: Then what you are telling this jury, Mr. Casteneda–Perez, is that Officer Grady is lying when she [sic] says that you stood facing Officer Barnett for approximately a minute?
MR. WACKERMAN: Objection[,] testifying on the part of the state, a comment on the evidence.
THE COURT: Overruled.
MR. WACKERMAN: Objection, nonresponsive.
. . . .
[CASTENEDA–PEREZ]: I am saying that if she saw me standing there, she saw me standing there. But I don't know what else happened. I was just standing there. I don't know what happened behind me or who did what, no.

An objection that the question had been asked and answered was overruled, and the prosecutor continued:

Q: Mr. Casteneda–Perez, are you also telling this jury that Officer Barnett is lying when she testified that she had contact with you on the corner of 2nd and Pike?

A: Well, never did I have contact with her for as long as a minute. And what she did behind me, what she said, I don't know.

Later on, the prosecutor tried again:

Q: Mr. Casteneda–Perez, yes or no, Officer Unger is lying when he says he saw you or at least your white tennis shoes contacting Officer Barnett for an extended period of time? Yes or no.

A: What I don't understand if you are saying that those are my clothing, that's true, that was my clothing. But the truth is I never talked to her for a long time.

The trial court permitted the deputy prosecutor to continue in her efforts to get Casteneda–Perez to state his opinion on the truthfulness of Officer Grady's testimony. The deputy prosecutor continued:

Q: Is Officer Grady telling the truth or not?

A: You are saying that I was there when they say I was there I was there. But if they are saying that I had talked with her, I entered a conversation with her, that's not true.

Q: The question again Mr. Casteneda–Perez, let me try to rephrase it. Officer Grady testified that he saw you facing Officer Barnett for approximately a minute. Is that true or is that false?

A: It's false.

Q: That's a lie?

A: Yes, it's a lie.

Similar questions were asked of Gonzales, who indicated that certain testimony might not be true, but he did not testify that the police were lying. However, in closing, the deputy prosecutor indicated that Gonzales had called Officers Barnett and Grady liars. Defense counsel's objection was overruled.

Casteneda–Perez was found guilty as charged. The jury failed to reach a verdict concerning Gonzales.

## IMPROPER CROSS EXAMINATION

Casteneda–Perez argues that the persistent effort by the prosecutor to get the witnesses and defendant to say the officer witnesses were lying was improper, prejudicial, and denied him a fair trial. The prejudice, he argues, comes from equating an acquittal with a finding the police officers had committed perjury.

The State's response is that because credibility was a key issue, it was necessary for the jury to know whether the defendant and defense witnesses were saying the officers were merely mistaken or were lying.

Lying is stating something to be true when the speaker knows it is false. As the word "lie" was used by the prosecutor, it meant giving testimony which the officer witness knew to be false for the purpose of deceiving the jury. The tactic of the prosecutor was apparently to place the issue before the jury in a posture where, in order to acquit the defendant, the jury would have to find the officer witnesses were deliberately giving false testimony. Since jurors would be reluctant to make such a harsh evaluation of police testimony, they would be inclined to find the defendant guilty. While such a prosecutorial tactic would be totally unavailing in a bench trial, we cannot be confident it would not be effective with some jurors. With the prosecutor persistently seeking to get the witnesses to say that the officer witnesses were lying, and doing so with the trial court's apparent approval, it is readily conceivable that a juror could conclude that an acquittal would reflect adversely upon the honesty and good faith of the police witnesses.

We have very little case law in Washington on this practice. Washington cases have held generally that weighing the credibility of a witness is the province of the jury and have not allowed witnesses to express their opinions on whether or not another witness is telling the truth. *State v. Swenson,* 62 Wn.2d 259, 283, 382 P.2d 614 (1963); *State v. Fitzgerald,* 39 Wn. App. 652, 657, 694 P.2d 1117 (1985); *State v. Maule,* 35 Wn. App. 287, 297, 667 P.2d 96 (1983); 5A K. Tegland, Wash. Prac. § 292, at 399 n.4 (3d ed. 1989).

A recent Court of Appeals case, *State v. Barrow,* 60 Wn. App. 869, 809 P.2d 209 (1991), addressed the similar issue of attacking witness credibility during the prosecutor's closing argument. In *Barrow,* which coincidentally involved an arrest following an undercover purchase of a cocaine–like substance, the deputy prosecutor argued that by giving

testimony contradictory to that of the police officers who testified for the State, the defendant was, in effect, calling the police officers liars. *Barrow*, at 874.

The *Barrow* court held that the deputy prosecutor's argument constituted misconduct and noted that it was a mischaracterization to say that the defendant was calling the police officers liars because the defendant's testimony could have led the jury to believe merely that the officers were mistaken as to the seller's identity. However, the *Barrow* court declined to reverse Barrow's conviction on the basis of this prosecutorial misconduct, partly because of the failure of Barrow's counsel to adequately object to the argument and, more importantly, because it was not substantially likely that the comments affected the jury's verdict. *Barrow*, at 876–77.

Another case in point is *State v. Green*, 71 Wn.2d 372, 428 P.2d 540 (1967), where the State presented police officer testimony that when they captured the defendant, he was wearing one black glove and the police found a buckskin glove beneath the defendant in the shrubs. Another officer had testified that when they arrived at the scene of the burglary, they saw a man dressed all in black fleeing the scene. *Green*, at 373–74, 380. In cross–examining the defendant, the following exchange took place:

> Q. What kind of gloves were you wearing when you were arrested, Mr. Green? A. Black gloves. Q. Both gloves? A. Yes. Q. And the officers were mistaken when they said one was black and one was a pigskin glove? A. I'm sure they were. Q. Or lying. As a matter of fact, Mr. Green, if I believe your testimony, we have to—Mr. Hemmen: I object. The Court: Sustain the objection. Counsel, I will have to ask you not to continue this line of questioning. This conduct, we will have no more of it.

*Green*, at 380–81. The *Green* court described the query as "argumentative, impertinent, and uncalled for". *Green*, at 381. The opinion contains no analysis as to why the query was considered "argumentative, impertinent, and uncalled for". However, the questioning was obviously leading to the point of trying to get the defendant to say that in order to

believe his testimony, one would have to conclude that the police officer witnesses were lying.

The practice of questioning during cross examination for the purpose of compelling a defendant or a defense witness to state that law enforcement officers lied in giving adverse testimony is generally condemned by the cases which have considered it.

In *United States v. Richter*, 826 F.2d 206 (2d Cir. 1987), the prosecutor asked the defendant in a series of questions to testify that an FBI prosecution witness was either mistaken or lying. The court held this was improper cross examination because determination of credibility was for the jury, not for witnesses. The prosecutor, in closing argument, accused the defendant of claiming that the agents were lying. The *Richter* court cited prior federal cases in support of the statement that prosecutors are to avoid statements to the effect that "if the defendant is innocent, government agents must be lying." *Richter*, at 209. Richter's conviction was reversed on the ground of prosecutorial misconduct.

*Freeman v. United States*, 495 A.2d 1183 (D.C. 1985) held that one witness may not express a view or opinion on the credibility of another witness' testimony.

*People v. Adams*, 148 A.D. 964, 539 N.Y.S.2d 200 (1989) held requiring a defendant during cross examination to characterize police testimony as a lie was a tactic to be condemned.

*People v. Riley*, 63 Ill. App. 3d 176, 185, 379 N.E.2d 746, 753 (1978) held that asking on cross examination whether the defendant was asserting that the State's witnesses had told "'a bunch of lies'" was improper. The court stated it called for defendant's opinion concerning veracity of other witnesses and thereby invaded the province of the jury.

■■ Unquestionably, to ask a witness to express an opinion as to whether or not another witness is lying does invade the province of the jury. *State v. Fitzgerald, supra.* A stronger reason for barring such interrogation, however, is that it is misleading and unfair to make it appear that an

acquittal requires the conclusion that the police officers are lying. The testimony of a witness can be unconvincing or wholly or partially incorrect for a number of reasons without any deliberate misrepresentation being involved. The testimony of two witnesses can be in some conflict, even though both are endeavoring in good faith to tell the truth. It is for these reasons that most courts that have addressed the problem, so far as our research discloses, have condemned the practice and will not permit it. Likewise, we find the practice improper and condemn it. It is contrary to the duty of prosecutors, which is to seek convictions based only on probative evidence and sound reason. *State v. Huson,* 73 Wn.2d 660, 663, 440 P.2d 192 (1968), *cert. denied,* 393 U.S. 1096 (1969).

■■ While the cross examination of the defendant and other witnesses was improper, the error is not of constitutional magnitude. In such a case, the error is harmless unless there is a substantial likelihood that it influenced the outcome of the trial. *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984).

HARMLESS ERROR

■ When the tactic of asking the objectionable questions first occurred, the objection was inadequate to preserve error. The only objection was that the question "calls for a comment on the evidence." "Comment on the evidence" is too general to meet the requirement that objections must state specific grounds so that the trial court is informed on the issue and the adversary has an opportunity to correct it.

> When an objection is so indefinite as not to call the court's attention to the real reason for the testimony's inadmissibility, error may not be based upon the overruling of the objection. *Coleman v. Montgomery,* 19 Wash. 610, 53 Pac. 1102 [1898].

*State v. Boast,* 87 Wn.2d 447, 451, 553 P.2d 1322 (1976) (quoting *Kull v. Department of Labor & Indus.,* 21 Wn.2d 672, 682–83, 152 P.2d 961 (1944)).

Defense counsel, in his objections, never did apprise the trial court of the prejudicial aspect of the line of questioning, which is that it equates an acquittal with false testimony on the part of the police officers. However, after the objectionable question had been asked and answered several times, counsel did register an objection on the ground that the question called for the witness to comment on the truthfulness of another witness. This was a valid objection and should have been sustained.

Where the improper cross examination had been repeated several times without being properly objected to, there technically was no error on the part of the trial court in admitting it. Furthermore, much of the damage from this type of questioning was done prior to the time that a valid objection was made. Our review of the record satisfies us that the objectionable testimony that was admitted after a valid objection was made was not sufficiently damaging that we can say there is a reasonable probability it affected the outcome of the trial.

This is true in this case for several reasons. One is that it was very seldom that the prosecutor was able to get a witness to state that he thought the police officers were lying. Most of the time, the witnesses answered the questions about "lying" by saying that they did not know one way or another, or that perhaps the witness was only mistaken. These answers by the witnesses would have alerted the jury to the fact that there can be conflicts in testimony based on many reasons other than deliberate false testimony.

The police officer testimony in this case was believable and was corroborated. The testimony of Casteneda–Perez, Rodriguez, and Gonzales was not persuasive in that they all insisted that they were totally unacquainted with each other until after they met in jail. There was persuasive, corroborated testimony that they were together in a group at the time Officer Barnett approached Casteneda–Perez and at the time the drug transaction was completed.

Lastly, another persuasive reason why we believe the error did not influence the verdict is that the jury was

unable to reach a verdict in the case against Gonzales. This indicates that the jury separated the case against Gonzales from the case against Casteneda–Perez in its deliberations and that the jury's verdicts were not biased by the improper cross examination.

The judgment is affirmed.

BAKER and AGID, JJ., concur.

Reconsideration denied June 27, 1991.